**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | **:** | |
| **UNITED STATES,** | **:** | **CRIMINAL ACTION** |
| | **:** | |
| v. | **:** | |
| | **:** | |
| **THOMAS L. ROOT** | **:** | **No. 07-149** |
| | **:** | |

**<u>MEMORANDUM AND ORDER</u>**

**Schiller, J.** **June 10, 2008**

Defendant Thomas Root moves this Court for a judgment of acquittal or, alternatively, for a new trial following convictions for conspiracy to defraud the United States and for tax evasion. For the following reasons, the Court denies his motions.

## I.    BACKGROUND

### A.    Factual background

Because the Court is tasked with reviewing the jury's verdict, the following facts are viewed in a light most favorable to the Government. *See, e.g.*, *United States v. Frorup*, 963 F.2d 41, 42 (3d Cir. 1992).

#### 1.    *Defendant's Reading Broadcasting, Inc.-related income*

In the mid-1990s Defendant, a former attorney, began working as a special projects director at Reading Broadcasting, Inc. ("RBI"), an independent television station based in Reading, Pennsylvania that operated channel 51. (Mar. 17, 2008 Tr. at 23, 28; Mar. 18, 2008 Tr. at 27-28, 31.) In this capacity, Defendant was the administrative assistant to Micheal Parker, president of RBI; Defendant would review contracts and address compliance with Federal Communications

Commission and Equal Employment Opportunity Commission regulations.  (Mar. 18, 2008 Tr. at 31-32.)  Although Defendant lived in Norwalk, Ohio, he would occasionally commute to Reading in connection with his job. (Mar. 17, 2008 Tr. at 27, 94; Mar. 18, 2008 Tr. at 46-47, 135-36.) Defendant was a salaried employee, and had an arrangement with RBI whereby he would be reimbursed for job-related expenses, including expenses related to travel, cell phone use and legal research.  (Mar. 18, 2008 Tr. at 40-41.)

Parker left RBI in May 2001, and was replaced by Frank McCracken.  (*Id.* at 35.)  Defendant continued his employment at RBI as a special projects director, and worked as McCracken's right-hand man — Defendant prepared filings, gave advice on contracts, addressed FCC compliance issues, prepared shareholder newsletters and RBI annual reports, drafted memos for McCracken, and dealt with Bill Maslo, RBI's accountant, RBI's vendors and RBI's customers.  (Mar. 17, 2008 Tr. at 23-24, 27, 31-32, 35-36, 69, 92-93, 128-29, 185; Mar. 18, 2008 Tr. at 40; *see, e.g.*, Gov't Ex. 18 (E-mail from Root to McCracken attaching Memo) & 36 (E-mail from Root to Maslo).)  Defendant would occasionally attend shareholder meetings and give presentations to the Board of Directors on McCracken's behalf.  (Mar. 17, 2008 Tr. at 129.)  He was also responsible for preparing the Form 1099s that were issued by RBI for the years 2002, 2003 and 2004.[1]  (*Id.* at 26-27.)

In summer 2001, Master Media Enterprises, Inc. ("Master Media") became RBI's sales

---

[1]A Form 1099 is an IRS form that a business issues to an individual who is not an employee, but who earns income, such as a bonus or commission, in excess of $600.00. (Mar. 19, 2008 Tr. at 45-47.)  This form is also sent to the IRS for tax years in which the income is earned.  (*Id.* at 47.)  In contrast, a W-2 is a form given to employees at the end of the tax year indicating the amount of money the employee has earned during that tax year and the amount of taxes withheld by the employer.  (*Id.* at 45-46.)  The employer also files a copy of its employees' W-2 forms with the IRS.  (*Id.* at 46.)  Income taxes are not withheld through a Form 1099 as they are with a W-2.  (*Id.*)

representative, in which capacity it sold RBI air time. (*Id.* at 39, 130.) In August 2001, McCracken sent a memo to Barbara Williamson, RBI's bookkeeper, directing her to pay commissions on Master Media's sales of RBI air time as follows: ten percent to Frank McCracken, two percent to Brenda Peiffer, two percent to Defendant, and one percent to herself. (*Id.* at 22-23, 39; Gov't Ex. 20 (8/16/2001 Commission Memo).) These payments were essentially a salary increase for Defendant and Williamson, since neither of them were involved in sales. (Mar. 17, 2008 Tr. at 40-41, 94-95, 129.) The commissions were initially paid through payroll, along with each recipient's salary, and taxes were withheld from those commissions as reflected on each recipient's W-2 forms. (*Id.* at 43-44, 82.)

On October 8, 2001, Defendant wrote a memo to McCracken, requesting that his commissions be paid to an Ohio limited liability company ("LLC"), KGR New Perspectives, LLC ("New Perspectives"). (Gov't Ex. 21 (Root Commission Payments Memo).) Shortly thereafter, on November 19, 2001, McCracken directed Williamson to pay his own commissions to Framco, LLC, ("Framco") and Defendant's commissions to New Perspectives, LLC. (Mar. 17, 2008 Tr. at 48; Gov't Ex. 23 (11/19/2001 Payment of Commissions Memo).) Defendant created both of these companies. (Mar. 17, 2008 Tr. at 53; Mar. 18, 2008 Tr. at 181, 225-26; Gov't Ex. I-7 (Framco Set-up) at INT/MYC 000014-16.) As a result of this change in payment, the commissions were no longer reflected in Defendant and McCracken's W-2 forms. (Mar. 17, 2008 Tr. at 50-51, 203.)

In January 2002, Williamson asked McCracken and Defendant whether she should issue Form 1099s to New Perspectives and Framco, to account for the taxes owed by those entities. (*Id.* at 51.) McCracken and Defendant, who was on speaker phone during the conversation, both responded that they did not know whether Form 1099s were necessary and that they would look into

the matter and report back to her.  (*Id.*)  When Williamson inquired a second time, McCracken told

her that she did not need to issue Form 1099s to New Perspectives and Framco; Williamson could

not recall whether Defendant was on the phone during this second conversation.  (*Id.* at 51, 74.)

Accordingly, Williamson did not issue Form 1099s to those entities and as a result, RBI did not

notify the IRS of these payments.  (*Id.* at 52.)

    In early 2003, shareholders raised concerns about the amount of money that RBI was

expending on commissions.  (*Id.* at 116-17, 187-90.)  Several RBI directors and shareholders

testified that they were unaware of the commission payments themselves and the fact that payments

were being made to New Perspectives and Framco.  (*Id.* at 98, 121-22, 131-35, 153; Mar. 18, 2008

Tr. at 145-46.)  One shareholder testified that when he asked McCracken about the commissions

after a 2003 board meeting, McCracken responded that he, Williamson, Defendant and Peiffer were

receiving commissions; McCracken did not mention Framco or New Perspectives.  (Mar. 19, 2008

Tr. at 173-76.)  Another shareholder testified that he wrote a letter to McCracken inquiring about the

increase in commissions and received a response from McCracken that made no mention of the

commission payments at all, nor of Framco and New Perspectives; the response instead characterized

the increased commission-related expenditures as reflective of "aggressive sales efforts."  (Mar. 17,

2008 Tr. at 116-19; Gov't Ex. 114 (2/12/2003 Massey Letter to McCracken) &116 (3/3/2003

McCracken Letter to Massey).)

    McCracken resigned as President of RBI in June 2004.  (Mar. 17, 2008 Tr. at 140-43.)

Parker returned to RBI at that time and immediately began an internal investigation, which revealed

that McCracken, Defendant, Williamson and Peiffer had been receiving commissions and that

McCracken and Defendant had their commissions paid to Framco and New Perspectives.  (*Id.* at

140-43, 200-03; Mar. 18, 2008 Tr. at 96-97, 121; Gov't Ex. 53 (Parker Letter to Directors Attaching Root Memo.).)   Parker concluded that McCracken did not have the authority to grant himself commissions without approval of the Board, but that McCracken had the authority to grant payments to RBI employees. (Mar. 18, 2008 Tr. at 96-97.)   Consequently, Parker terminated all of the commission payments and granted salary increases to Williamson, Peiffer, and Defendant.  (Mar. 17, 2008 Tr. at 78-79, 147; Mar. 18, 2008 Tr. at 96-97, 143-44.)   In connection with this investigation, Parker asked Defendant to prepare a memo explaining how the commission payments came about.  (Mar. 18, 2008 Tr. at 99-100.)  Defendant's memo did not disclose that commissions were being paid to New Perspectives and Framco.  (*Id.* at 108; Gov't Ex. 52 (Memo. from Root to Parker on Commissions).)

The total commissions payments made to New Perspectives from late 2001 through mid-2004 was $94,077.34.   (Mar. 19, 2008 Tr. at 78; Gov't Ex. 65 (Vendor Payment Journal for New Perspectives) & JS-2 (Summary of Payments to New Perspectives).)  The payments made to Framco between 2001 and 2004 totaled $509,210.43. (Mar. 19, 2008 Tr. at 76; Gov't Ex. JS-1 (Summary of Payments to Framco).)  The New Perspectives payments were deposited into a personal account for Kathy Root, Defendant's wife, and into a New Perspectives company account on which Kathy Root was the sole signatory.  (Mar. 19, 2008 Tr. at 79-85, 224.)   Kathy Root testified that she used the payments for daily living expenses.  (*Id.* at 246-47.)  Framco payments were deposited into a variety of business and personal accounts maintained by McCracken.  (*Id.* at 80.)

2.   *The Commission Agreement between RBI and New Perspectives*

In late November 2001, Defendant and his wife, Kathy Root, applied for a loan for purposes of refinancing the mortgage on their home.  (Mar. 17, 2008 Tr. at 155-58, 165; Gov't Ex. CB-1

(Root Loan Application).)   In addition to listing Defendant's salary as income on their loan application, the Roots listed $3,000.00 of monthly income attributable to Kathy Root.  (Mar. 17, 2008 Tr. at 165; Gov't Ex. CB-1.)  In order for the bank to approve their loan, the Roots were required to produce verification of the income they listed on their application.  (Mar. 17, 2008 Tr. at 161.)  On December 1, 2001, McCracken signed a "Commission Agreement" between RBI and New Perspectives, which Kathy Root signed on behalf of New Perspectives.  (Gov't Ex. 24 (Commission Agreement).)  The Roots subsequently sent a copy of the Commission Agreement and copies of checks from RBI made out to New Perspectives to the bank to document the monthly $3,000.00 they declared on their loan application.  (Mar. 17, 2008 at 165-71; Mar. 19, 2008 Tr. at 227; Gov't Ex. CB-5 (12/18/01 Faxed Commissions Agreement) & CB-6 (Checks to New Perspectives).)

The Commission Agreement purported to pay New Perspectives a two percent commission on monthly revenues that RBI collected from Master Media in exchange for "sales services to TV 51 in acquiring a programming agreement with Master Media Enterprises, Inc." and related services. (Gov't Ex. 24 (Commission Agreement).)  Although Kathy Root testified that she assisted her husband with graphics for RBI annual reports, Williamson and various RBI directors and shareholders testified that they were not aware of any sales services or other work that Kathy Root performed for RBI, nor were they aware of a Commission Agreement with New Perspectives.  (Mar. 17, 2008 Tr. at 24, 54-55, 95-97; Mar. 18, 2008 Tr. at 114; Mar. 19, 2008 Tr. at 234.)  Indeed, Williamson testified that she interacted solely with Defendant with respect to New Perspectives, and that she never had any dealings with Kathy Root.  (Mar. 17, 2008 Tr. at 54-55.) Parker testified that he found the New Perspectives Commission Agreement in a file labeled "Framco."  (Mar. 18, 2008

6

Tr. at 112-13, 122.)

    3.  *LISA income from Ford and Merullo*

  In addition to his employment with RBI, Defendant performed legal work for two attorneys

in Ohio, George Ford and Victor Merullo.  Ford hired Defendant to do legal research and writing,

and paid him $250.00 a week; Defendant was also reimbursed for expenses.  (*Id.* at 165-67.)

Initially, Ford paid Defendant a salary from which taxes were withheld and issued Defendant a W-2.

(*Id.* at 165.)  After Defendant began working for RBI in 1997, however, Defendant had Ford make

payments to his company, Legal Information Services Associates ("LISA").  (*Id.*  at 167-69, 71.)

At this point, Ford ceased filing W-2s for Defendant and paid Defendant as an independent

contractor through LISA without withholding any taxes.[2]  (*Id.* at 170-71; GF-2 (Checks to LISA).)

Ford did not issue any Form1099s to LISA.  (Mar. 18, 2008 Tr. at  170.)  During the years 2001

through 2003, Defendant earned $58,041.91 from George Ford.  (Mar. 19, 2008 Tr. at 89.)

Defendant did not disclose this income on his tax returns for those years.  (*Id.* at 104-13.)

  Merullo hired Defendant in 1999 as an independent contractor to perform legal research

services.  (Mar. 18, 2008 Tr. at 200-202.)  Merullo paid Defendant $70.00 per hour, and would pay

certain pre-approved expenses.  (*Id.* at 203.)  As with Ford, Defendant directed Merullo to pay him

through LISA.  (*Id.* at 205; Gov't Ex. VM-1 (Checks to LISA).)  Merullo did not issue any Form

1099s to LISA because he thought that LISA was a corporation, since Defendant's invoice listed the

company name as "Legal Information Services Associates, Inc."  (Mar. 18, 2008 Tr. at 205-06; Gov't

Ex. VM-2 (LISA Invoices).)  During the years 2001 through 2003, Defendant earned $19,573.85

---

  [2] Ford was also in the process of repaying Defendant on a loan.  Thus, for a period of time, he wrote weekly checks to Defendant for $300.00, which encompassed Defendant's $250.00 salary and $50.00 in loan repayment. (Mar. 18, 2008 Tr. at 174-75.)

from Merullo.  (Mar. 19, 2008 Tr. at 90; Gov't Ex. JS-6 (Summary of Merullo Income).)  Defendant

did not disclose any of this income on his tax returns for those years.  (Mar. 19, 2008 Tr. at 104-13.)

                4.     *Additional Parker income*

In addition to acting as Parker's assistant at RBI, Defendant did other, unrelated work for

Parker.  (Mar. 18, 2008 Tr. at 42-46.)  Defendant set up numerous companies, including LLCs, for

Parker in connection with Parker's various business ventures.  (*Id.* at 42-49; Gov't Ex. 25

(12/20/2001 E-mail from Root to Parker).)  Parker would pay Defendant a "success fee" or "bonus"

for his work on these non-RBI projects; as well as covering Defendant's related expenses.  (Mar. 18,

2008 Tr. at 49-51, 54; Gov't Ex. 81 (Register for Two if by Sea Broadcasting).)  At times, Parker

would make these payments to LISA.  (Mar. 18, 2008 Tr. at 78-79; Gov't Ex. 81.3 (Wire to LISA)

& 82.2 (Wire to LISA).)  Parker never issued any Form 1099s to Defendant in connection with these

payments.  (Mar. 18, 2008 Tr. at 51.)

There was conflicting evidence at trial as to whether Parker's payments to Defendant

constituted income or loans.  Parker testified that he did not have the authority to issue certain checks

because of a dispute with his business partners.  (*Id.* at 57-58, 66, 68.)  Accordingly, Parker told

Defendant that he would issue those checks as loans, even though the memo line on the checks

reflected that payments were bonuses.[3]  (*Id.* at 57, 69.)  After Parker worked through matters with

his business partners, the payments to Defendant were authorized as bonuses; Parker could not recall,

however, whether he informed Defendant of this change. (*Id.* at 73, 69.)

In connection with these and other payments, Parker issued Defendant three promissory

---

[3] Parker testified at the grand jury that these checks were bonuses, and the Government
impeached him with that testimony.  (Mar. 18, 2008 Tr. at 63, 70, 86.)

notes.  (Gov't Ex. 87 (1/21/2001 Promissory Note) & 88 (12/19/2000 Promissory Note) & 89 (7/2/2002 Promissory Note).)  Parker never made any effort to collect on those notes, nor did Defendant endeavor to make payments. (Mar. 18, 2008 Tr. at 66-67, 71-73, 91-92, 94.)  This was in part because Parker and his partners considered the notes invalid after their business dispute was resolved.  (*Id.* at 73-74.)  Accordingly, Parker's company treated those checks initially written as loans to be bonuses, and wrote them off as expenses in connection with their tax returns.  (*Id.* at 74-75.)  Defendant earned a total of $56,000.00 from Parker in 2001 and 2002.[4]  (Mar. 19, 2008 Tr. at 91-93; Gov't Ex. JS-11 (Summary of Parker Income).)

> 5.      *Defendant's tax returns and amended tax returns*

Defendant prepared and filed joint tax returns for himself and his wife for the tax years 2001, 2002, and 2003.  (Mar. 18, 2008 Tr. at 220-21; Gov't Ex. I-4 (2001 Tax Return) & I-5 (2003 Tax Return) & IRS-3 (2002 Tax Return).)   He did not disclose the commissions he received from RBI for those years, which amounted to $77,277.68, nor the income he earned from Ford, Merullo and Parker, which amounted to $52,133.82 in 2001, $96,248.72 in 2002, and $62,510.90 in 2003.  (Mar. 19, 2008 Tr. at 93-96, 104-13; Gov't Ex. JS-13 (Summary of Undisclosed Income).)  Consequently, Defendant owed an additional $11,571 in taxes in 2001, $19,619 in taxes in 2002, and $6,473 in 2003.[5]  (Mar. 19, 2008 Tr. at 55-56.)  No tax returns were filed for New Perspectives for those tax years.  (*Id.* at 237-38; Gov't Ex. IRS-14 (Record of No Return for 2001) & IRS-15 (Record of No

---

[4] Although Defendant's analyst testified that these payments should have been considered loans, looking at the evidence in a light most favorable to the Government, sufficient evidence supports the conclusion that these payments constituted income.  (*see* Mar.19, 2008 Tr. at 181-82.)

[5] These figures excluded reimbursed expenses and loan repayments from George Ford from taxable income. (Mar. 19, 2008 Tr. at 95-103.)

Return for 2002) & IRS-16 (Record of No Return for 2003).)

On June 11, 2004, New Perspectives was served with a grand jury subpoena. (Mar. 19, 2008 Tr. at 113-14.) That same day, Defendant prepared amended tax returns for 2001, 2002, and 2003, which Kathy Root signed on June 15, 2004, which disclosed the commissions payments to New Perspectives made in those years. (*Id.* at 114-19; Gov't Ex. IRS-5 (2003 Amended Tax Return) & IRS-6 (2002 Amended Tax Return) & IRS-7 (2001 Amended Tax Return).) In April 2006, Defendant filed a second amended return for the year 2002 in which he claimed additional expenses. (Mar. 18, 2008 Tr. at 233; Mar. 19, 2008 Tr. at 206; Gov't Ex. IRS-8 (2002 Second Amended Tax Return).) Defendant never disclosed the income from Ford, Merullo or Parker. (Mar. 19, 2008 Tr. at 114-119.)

### B.      Procedural history

On March 20, 2007, Defendant was charged with one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count One), one count of tax evasion for the years 2000 through 2003 in violation of 26 U.S.C. § 7201 (Count Two), and seven counts of filing a false tax return in violation of 26 U.S.C. § 7206(1) (Counts Three through Nine). The conspiracy charged in Count One alleged that Defendant and McCracken agreed to defraud the United States by impeding the lawful function of the Internal Revenue Service ("IRS") in the assessment and collection of income taxes.

Count Two alleged that Defendant evaded payment of more than $40,000.00 in income taxes across the years 2000, 2001, 2002 and 2003. The income which Defendant was alleged to have concealed from the IRS over the course of these years falls into three general categories: (1) commission from his employer, RBI, that he funneled through New Perspectives; (2) payments he

received from Ford and Merullo through LISA; and (3) income earned from Parker.  Defendant was alleged to have concealed RBI-related income only in the tax years 2001, 2002 and 2003; in other words, Defendant did not conceal any income from RBI in the tax year 2000.

In July 2007, Defendant filed a pre-trial omnibus motion requesting, among other things, dismissal of Counts Two through Nine for lack of venue.  In response, the Government agreed to dismiss without prejudice Counts Three through Nine so they could be pursued in the Northern District of Ohio.  (Gov't's Resp. to Def.'s Pre-Trial Mots. at 9.)  However, the parties disagreed as to Count Two.  Defendant argued that "Count Two, to the extent that it alleges events from 2000, is Constitutionally infirm because all of the allegations of evasive acts and tax deficiency for the year covered by the 2000 tax return occurred exclusively in Ohio." (Def.'s Omnibus Pretrial Mot. at 11-12.)  Defendant also argued that venue was improper over Count Two because it included LISA and Parker income that was not related to the Eastern District of Pennsylvania.  (*Id.* at 21.)  Ultimately, following a hearing, this Court denied Defendant's motion without prejudice, noting that the Defendant would have the opportunity to reassert any objection to venue at trial.  (Sept. 25, 2007 Order ¶ 1.)

In the weeks leading up to trial, Defendant again attacked Count Two, asking the Court to dismiss Count Two as duplicitous, and reasserting his venue objection.  (Def.'s Mem. in Supp. of Mot. to Dismiss Count Two of Indictment at 2.)  Following a telephone conference, the Government agreed to drop the allegations pertaining to the year 2000 from Count Two of the Indictment.  On March 17, 2008, Defendant proceeded to trial on the entirety of Count One and the remainder of Count Two, pertaining to the years 2001 through 2003. On March 20, 2008, a jury returned a verdict of guilty on both counts.  (Mar. 20, 2008 Tr. at 83-84.)

11

## II.    STANDARD OF REVIEW

When considering a claim that the evidence was insufficient to support a conviction pursuant to Federal Rule of Criminal Procedure 29, a district court views the evidence, both direct and circumstantial,  "in the light most favorable to the government and affirm[s] the judgment if there is substantial evidence from which any rational trier of fact could find [the defendant] guilt[y] beyond a reasonable doubt."  *Frorup*, 963 F.2d at 42; *see also  United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003); FED. R. CRIM. P. 29.   In doing so, a court must "credit all available inferences in favor of the government."  *United States v. Riddick*, 156 F.3d 505, 509 (3d Cir. 1998). If evidence emerges from the trial that supports the jury's verdict, regardless of how probative the court believes it to be, then a defendant's motion for acquittal based on insufficient evidence should be denied.  *See United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989).  "The 'contention that the evidence also permits a less sinister conclusion is immaterial.  To sustain the jury's verdict, the evidence does not need to be inconsistent with every conclusion save that of guilt.'"  *United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002) (*quoting United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998)).

Pursuant to Federal Rule of Criminal Procedure 33, a court may grant a new trial "if the interest of justice so requires."  FED. R. CRIM. P. 33(a).  A district court has discretion to "grant a defendant a new trial only if it finds that 'there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted.'" *United States v. Rich*, 326 F. Supp. 2d 670, 673 (E.D. Pa. 2004) (*quoting United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). "Additionally, the court must grant a new trial if errors occurred during the trial, and it is reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." *Id.*

(*citing United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994)).

## III.   DISCUSSION

### A.   Defendant is not entitled to a judgment of acquittal

#### 1.   The jury's verdict on the conspiracy charge is supported by sufficient evidence

In order to prove a conspiracy to defraud the United States in violation of 18 U.S.C. § 371 the Government must prove beyond a reasonable doubt: (1) the existence of an agreement to defraud the United States; (2) the defendant's participation in that agreement with the intent to defraud the United States; and (3) an overt act by one of the conspirators in furtherance of that objective. *United States v. McKee*, 506 F.3d 225, 238-44 (3d Cir. 2007); *see also Gambone*, 314 F.3d at 176. Where a defendant is charged with a "Klein" conspiracy, as Defendant is here, the "agreed-upon objective must be to impede the IRS" from its lawful collection of federal income taxes. *See United States v. Gricco*, 277 F.3d 339, 348 (3d Cir. 2002); *see also United States v. Klein*, 247 F.2d 908 (2d Cir. 1957).

"[A] conspiratorial agreement can be proven circumstantially based upon reasonable inferences drawn from actions and statements of the conspirators or from the circumstances surrounding the scheme." *McKee*, 506 F.3d at 238. However, "'[w]hen the government relies upon circumstantial evidence to establish a tax conspiracy, the circumstances must be such as to warrant a jury's finding that the alleged conspirators had some common design with unity of purpose to impede the IRS.'" *Id.* at 240 (*quoting United States v. Adkinson*, 158 F.3d 1147, 1154 (11th Cir. 1998). To establish the requisite "unity of purpose" the government must establish that the

defendant "knew of the agreement and intended both to join it and to accomplish its illegal objects." *Id.* at 241. "[T]he evidence must be sufficient to prove beyond a reasonable doubt that impeding the IRS was one of the conspiracy's objects and not merely a foreseeable consequence or collateral effect." *Gricco*, 277 F.3d at 348.

Defendant argues that he is entitled to judgment of acquittal because the Government failed to prove both the existence of an agreement to impede the IRS from collecting income taxes and Defendant's participation in such an agreement. Defendant's argument, however, is premised on a view of the evidence that draws all the reasonable inferences in *his* favor or on facts that are immaterial.[6] When the evidence is viewed in a light most favorable to the Government, as it must be in resolving a Rule 29 motion, the record supports the jury's verdict on the conspiracy charge.

The totality of the evidence, taking all reasonable inferences in the Government's favor, supports a finding that Defendant and McCracken agreed to impede the IRS from taxing their commissions by funneling those commissions through LLCs and avoiding the issuance of Form 1099s to those LLCs. The evidence at trial illustrated that Defendant is a sophisticated defendant who is knowledgeable about legal issues, attuned to dealing with accountants, RBI board members and shareholders, and familiar with setting up limited liability companies. After McCracken informed Defendant, Williamson and Peiffer that they would be receiving commissions, Defendant requested in an October 2001 memo that his commission be assigned to New Perspectives, LLC. A reasonable jury could infer that Defendant requested this change in order to evade taxes on that

---

[6] For instance, Defendant makes much of the fact that prior to November 2001, before McCracken became president of RBI, McCracken gave himself an unauthorized sales commission. (Mar. 18, 2008 Tr. at 140-41.) This fact is wholly irrelevant as to whether McCracken and Defendant conspired to conceal the commissions McCracken authorized in November 2001 from the IRS.

income.  This inference is supported by the fact that Defendant was using the same means to avoid taxes on income earned from Ford and Merullo by requesting payment through LISA, and is further supported by the fact that Defendant could have impeded the issuance of a Form 1099 since he was responsible for preparing those forms for RBI during the relevant time period.  That McCracken adopted the same plan — to have his commissions paid through a limited liability company — shortly after receiving Defendant's October memo and had Defendant set up Framco on his behalf supports an inference that the two shared a purpose of evading income taxes.  Indeed, as a result of this change in payment, taxes were no longer withheld from Defendant and McCracken's commission payments.

The existence of an agreement between Defendant and McCracken to frustrate taxation of their commissions is further supported by Williamson's testimony.  It is undisputed that Williamson had a discussion with McCracken and Defendant regarding whether she was required to issue Form 1099s to New Perspectives and Framco, and that in a subsequent conversation, McCracken directed her not to issue Form 1099s to those entities.  As a result of this instruction, the IRS was not notified of the monies that RBI paid to New Perspectives or Framco.[7]  Whether or not Defendant was present for this second conversation, the jury could reasonably infer, in light of the above-mentioned  facts, that McCracken and Defendant agreed to misinform Williamson for purposes of concealing this income from the IRS. Although Defendant would have the Court and the jury believe that he was a bumbling fool when it came to tax matters, he was clearly familiar with Form 1099s in some

---

[7] That RBI ultimately issued a Form 1099 to New Perspectives for the 2004 tax year (Gov't Ex. 4 (New Perspectives 1099)), presumably as a result of the investigation following McCracken's departure, does not change the fact that no Form 1099s were issued for the prior three years in accordance with McCracken's instruction to Williamson.

respect since his job responsibilities included preparing such forms for RBI.  Furthermore, he acquired tax identification numbers for New Perspectives and Framco, (Gov't Ex. 31 (Framco Tax ID) & 32 (New Perspectives Tax ID)), which suggests that he was aware of an obligation to report income earned by those companies to the IRS, yet he clearly did not report New Perspectives's income.  Looking at the evidence in a light most favorable to the Government, the record supports an inference that Defendant was aware that a Form 1099 would alert the IRS to his commission payments and that he conspired with McCracken regarding an instruction to Williamson to prevent that from happening.  That McCracken and Defendant both endeavored to conceal the existence of Framco and New Perspectives from the RBI Board and shareholders provides additional support for the inference that they sought to conceal evidence of their scheme to hide these payments from the IRS.

Furthermore, that Defendant set up Framco for McCracken and that McCracken signed a fake commission agreement with New Perspectives, which was found in a folder labeled "Framco," evidences that this was not a matter of two individuals exhibiting similar but unconnected conduct, as Defendant suggests, but that Defendant and McCracken were acting jointly in furtherance of their scheme.  A jury could reasonably infer that the commissions agreement, signed by McCracken and Defendant's wife.  Indeed, there was no evidence that Kathy Root or New Perspectives performed any sales services on behalf of RBI and a jury could certainly disbelieve Defendant's suggestion that Kathy Root was being paid approximately $3,000.00 a month to occasionally spruce up RBI annual reports with graphics.  Whether or not New Perspectives currently conducts any legitimate business is besides the point — the evidence supports a finding that the company was a shell created primarily so that Defendant could evade taxes on his commissions.

16

In order to overcome this evidence, Defendant argues that the Government's conspiracy case must fail because the Government did not prove that McCracken evaded taxes on his Framco income.  Defendant overstates the Government's burden in a conspiracy case.  The Government need prove only an agreement between the Defendant and at least one other individual to impede the IRS, and an overt act by one of the conspirators in furtherance of that agreement; it need not prove that McCracken, who is not charged here, is also guilty of substantive tax evasion.  *See McKee*, 506 F.3d at 238-44 (explaining elements of conspiracy); *see also Gov't of Virgin Islands v. Hoheb*, 777 F.2d 138, 140 (3d Cir. 1985) (co-conspirator's guilt is irrelevant to a defendant's guilt where the two are not tried together).  Furthermore, whether or not McCracken himself evaded taxes, a jury could infer that McCracken told Williamson not to issue Form 1099s after conferring with Defendant on the matter, knowing that Defendant intended not to report New Perspectives income and intending to facilitate Defendant's plan.  *See Gricco*, 277 F.3d at 349 (upholding *Klein* conspiracy conviction where jury could infer that defendant, who orchestrated an embezzlement scheme and instructed participants in the scheme not to deposit their unlawful earnings in a bank but to instead keep them in a safe, intended for his co-conspirators not to pay taxes on those monies).

Overall, the record supports the existence of an agreement between Defendant and McCracken to impede the IRS.  Additionally, both Defendant and McCracken engaged in several overt acts in furtherance of that agreement including Defendant's creation of both LLCs, McCracken's instruction to Williamson, and McCracken's execution of the false Commission Agreement.  Accordingly, Defendant's motion for judgment of acquittal is denied.

       2.     *Defendant is not entitled to judgment of acquittal on the tax evasion charge*

Defendant does not argue that the guilty verdict on Count Two is unsupported by a

17

sufficiency of the evidence.  Instead, he argues that he is entitled to judgement of acquittal on Count Two because of "the infirmities in Count 2" that he raised before trial.  (Def.'s Mot. for J. of Acquittal at 17.)   Primarily, Defendant argues that Count Two is duplicitous because it impermissibly aggregates several years of tax evasion into one count.  Defendant also reasserts his argument that venue was improper over Count Two.

<em>i.     Count Two is not duplicitous</em>

A conviction for tax evasion under 26 U.S.C. § 7201 requires proof beyond a reasonable doubt of "1) the existence of a tax deficiency, 2) an affirmative act constituting an attempt to evade or defeat payment of the tax, and 3) willfulness."  *United States v. McGill*, 964 F.2d 222, 229 (3d Cir. 1992); *see also McKee*, 506 F.3d at 233.  "[S]ection 7201 proscribes the offense of tax evasion, which can be committed either by evading the assessment or evading the payment of taxes."  *United States v. Pollen*, 978 F.2d 78, 87 n.16 (3d Cir. 1992).  A defendant evades the assessment of taxes by impeding the IRS from assessing a tax on his or her income, for example, by filing a false tax returns and creating false documents.  *McGill*, 964 F.2d at 230.  Evasion of payment, on the other hand, generally involves concealment of the taxpayer's ability to pay his or her taxes by hiding assets from the IRS after tax returns have been filed.  *Id.* ("Affirmative acts of evasion of *payment* include: placing assets in the name of others; dealing in currency; causing receipts to be paid through and in the name of others; and causing debts to be paid through and in the name of others.").

Defendant argues that Count Two is duplicitous because the Government charged him with evading several years of taxes in one count, an improper unit of prosecution, instead of charging him with one count of evasion for each year at issue.  Defendant recognizes that one count of evasion covering several years might be appropriate in an evasion of *payment* case.  Although Defendant was

18

charged with evasion of payment and evasion of assessment, he argues that the evidence at his trial was akin to that of an evasion of *assessment* case, and thus, the Government's chosen unit of prosecution is, in retrospect, impermissible.

"Duplicity is the joining of distinct and separate offenses in a single count." *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir. 1998). In order to determine whether Count Two is duplicitous as Defendant alleges, the Court must first determine the appropriate unit of prosecution for a violation of 26 U.S.C. § 7201. *Id.* Generally speaking, the unit of prosecution for tax evasion in violation of 26 U.S.C. § 7201 is one tax year. *Pollen*, 978 F.2d at 84. The Third Circuit has recognized an exception to this rule, that the Government may "charge tax evasion covering several years in a single count as a 'course of conduct' in circumstances 'where the underlying basis of the indictment is an allegedly consistent, long-term pattern of conduct directed at the evasion of taxes for [the] years [in question].'" *Id.* (*quoting United States v. Shorter*, 809 F.2d 54, 58 (D.C. Cir. 1987)); *see also United States v. Kruckel*, Crim. A. No. 92-611, 1993 WL 765648, at **14-15 (D.N.J. Aug. 13, 1993).

In *United States v. Pollen*, the Third Circuit upheld four counts of tax evasion where each count was based on a different means of evasion for the same seven year period. 978 F.2d at 81-82. Similarly in *United States v. Shorter*, relied on by the Third Circuit in *Pollen*, the D.C. Circuit concluded that one count of tax evasion encompassing twelve tax years was not impermissibly duplicitous where the defendant engaged in a single scheme to evade taxes spanning those years. 809 F.2d 54, 57 (D.C. Cir. 1987), *abrogated on other grounds*, *Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579 (1993). Defendant makes much of the fact that in those cases, the defendants were charged with violating Section 7201 by evading *payment* of taxes. However, no where in *Pollen* did

the Third Circuit explicitly state that charging an evasion of assessment case in such a manner is impermissible.  Indeed, such a suggestion is baseless — nothing in Section 7201 indicates that a different unit of prosecution would apply depending on the means of tax evasion charged.  *Pollen*, 978 F.2d at 85-86 (neither the statutory language nor "section 7201's legislative history requires . . . [the conclusion] that Congress intended to limit this provision's unit of prosecution to an individual tax year").  Such a result would frustrate the Government's ability to charge both means of evasion in one count — which is clearly permissible under the Federal Rules of Criminal Procedure and relevant case law.  FED. R. CRIM. P. 7(c)(1) ("A count may allege . . . that the defendant committed [an offense] by one or more specified means."); *see also United States v. Mal*, 942 F.2d 682, 687-89 (9th Cir. 1991) (rejecting duplicity challenge where indictment charged evasion of assessment and evasion of payment); *United States v. Dunkel*, 900 F.2d at 107 (7th Cir. 1990) (charges incorporating allegations of evasion of payment and evasion of assessment were not duplicitous because "Section 7201 creates only one *crime*: tax evasion"), *vacated on other grounds*, 498 U.S. 1043 (1991).

Here, Defendant was charged with one continuous course of conduct spanning the years 2001 through 2003.  The Government alleged that Defendant evaded taxes over the course of these three years by funneling his earnings through LLCs, avoiding the issuance of Form 1099s to those LLCs, characterizing bonuses from Parker as loans instead of income, and failing to report all such income on his tax returns.  The evidence the Government would have used to prove evasion in 2001, 2002 and 2003 individually is the same evidence the Government in fact used to prove one count of tax evasion encompassing those years; this illustrates that Defendant exhibited the same pattern of evasive conduct for all three years in question, making prosecution based on that span of years appropriate.  *See Shorter*, 809 F.2d at 57 (continuous course of conduct existed where the same

20

evidence that would be used to prove evasive acts for each individual year of evasion would be used to prove one count of evasion spanning those years).   Furthermore, that Defendant knew exactly the allegations that he would be defending against — tax evasion for the years 2001 through 2003 by failing to report income from New Perspectives, LISA, and Parker — mitigates against any concern that he was prejudiced by the inclusion of all three years in one count.  *See Dunkel*, 900 F.2d at 107 (indictment charging evasion of assessment and evasion of payment was not duplicitous — defendant "knew exactly what he had to prepare to defend against and the jury knew its role as well").

Although the Government's choice to charge Defendant with one count of tax evasion for all of the years at issue, as opposed to three counts on a per year basis, may have been unorthodox, *Pollen* sanctions such an approach.[8]  Accordingly, Defendant's motion for judgment of acquittal is denied in this regard.

*ii.    Venue was proper with respect to Count Two*

The Constitution and Federal Rule of Criminal Procedure 18 require prosecution of a criminal defendant "in a district where the offense was committed."  FED. R. CRIM. P. 18; *see also United States v. Cabrales*, 524 U.S. 1, 6 (1998).   Where an offense continues across multiple districts, it may be prosecuted "in any district in which such offense was begun, continued, or

---

[8] Defendant further argues that he is entitled to judgment of acquittal because "a general verdict has been rendered on tax evasion during a three-year period from which it is impossible to tell whether Defendant was actually found guilty of tax evasion in any calendar year, the allowable unit of prosecution."  (Def.'s Mot. For Judgment of Acquittal at 21.)  As discussed above, the Indictment appropriately alleged a course of conduct spanning three years, and therefore charged Defendant in a permissible unit of prosecution.  Defendant's reliance on *United State v. House*, 524 F.2d 1035 (3d Cir. 1975), which did not address the unit of prosecution for tax evasion, is therefore misplaced.

completed." 18 U.S.C. § 3237(a).  "Because an 'attempt to evade' tax can occur over time and in

more than one judicial district, a violation of § 7201 is a 'continuing offense' within the meaning of

18 U.S.C. § 3237(a)."  *United States v. Strawberry*, 892 F. Supp. 519, 521 (S.D.N.Y. 1995); *cf.*

*Kruckel*, 1993 WL 76648, at *14, 14 n.11 (D.N.J. Aug. 13, 1993) (tax evasion considered continuing

course of conduct for statute of limitations purposes).  Thus, venue is appropriate in a tax evasion

case in any district where the defendant "engaged in some affirmative act with a tax evasion motive."

*Strawberry*, 892 F. Supp. at 521 (*citing United States v. Marchant*, 774 F.2d 888, 891 (8th Cir.

1985)).  The Government bears the burden of proving venue by a preponderance of the evidence.

*United States v. Perez*, 280 F.3d 318, 328-30 (3d Cir. 2002).

Here, a preponderance of the evidence at trial supports a finding that at least one affirmative

act of evasion occurred in the Eastern District of Pennsylvania.  As discussed above, the Government

agreed to dismiss any allegations of tax evasion pertaining to the year 2000, which did not include

any income earned from RBI.  Consequently, Defendant was only tried on tax evasion for the years

2001 through 2003.  Defendant himself conceded prior to trial that the allegations pertaining to RBI-

related income were properly venued in the Eastern District of Pennsylvania.  (Sept. 20, 2007

Hearing Tr. at 27; Mar. 7, 2008 Hearing Tr. at 5.)  Indeed, Defendant traveled to Reading in

connection with his job at RBI, and the memos he prepared to facilitate payment of his commissions

to New Perspectives, including the Commissions Agreement between RBI and New Perspectives,

were found at RBI's offices in Reading.  *See United States v. Martino*, Crim. A. No. 00-389, 2000

WL 1843233, at *3 (S.D.N.Y. Dec. 14, 2000) (venue was proper over tax evasion charges where

defendant sent faxes, placed phone calls and directed wire transfers to a bank within the district in

furtherance of her tax evasion scheme).  Consequently, venue was proper over Count Two.[9]

      **B.**     **Defendant is not entitled to a new trial**

         *1.*     *The jury charge was proper*

Defendant argues that he is entitled to a new trial because he was prejudiced by "the inclusion of ten unproven allegations in the final jury charge, over objection, which substantially influenced the jury's decision to convict the Defendant."  (Def.'s Mot. for New Trial at 3-5.)  Defendant's argument fails for several reasons.

First, this Court merely summarized the allegations in the Indictment so as to guide the jury, which it is clearly appropriate for a court to do.  *United States v. Smith*, 410 F. Supp. 1256, 1260 (D.C. Pa. 1976).  Second, Defendant's argument is again based on his biased view of the evidence. As discussed above, there was sufficient evidence at trial supporting the allegations in the Indictment.  As such, inclusion of these allegations in the jury charge cannot possibly be considered improper.  Third, after extensive discussions on the matter at the charge conference, and in an abundance of caution, this Court added language to the jury instructions to clarify that its references to the allegations in the Indictment were just that — references to *allegations*.  (Mar. 19, 2008 Tr. at 39.)  Finally, this Court's charge included instructions that the Indictment is not evidence, which the jury is presumed to have followed.  (Mar. 20, 2008 Tr. at 45.); *see, e.g.*, *Weeks v. Angelone*, 528

---

[9] Defendant argues that "had the jury considered evasion conduct on the allowable 'per year' basis, it may have found that tax evasion did not occur in one or more years because the only acts of evasion it could find were non-venued."  (Def.'s Mot. for J. of Acquittal at 25.)  If the Government charged Defendant with one count of evasion for 2001, one count of evasion for 2002 and one count of evasion for 2003, each "per year" count would still incorporate evasive conduct pertaining to RBI-related income, which occurred in this district.  Thus, Defendant's argument that the purported venue problem stems from the Government's decision to charge Defendant with one count of tax evasion spanning several years is nonsensical.

U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").  Accordingly, the Court did not err by summarizing the Indictment's allegations in the jury charge, nor has any miscarriage of justice has occurred here that would warrant a new trial.

2.    <em>The jury was not prejudiced by Williamson's comments</em>

Defendant argues that he is entitled to a new trial because the jury was prejudiced by two statements, both elicited by Defense Counsel in his cross-examination of Barbara Williamson: (1) that McCracken had been indicted and (2) that Defendant's hired investigator, Dennis Hanzel, told Williamson that Defendant was considering a guilty plea.  (Def.'s Mot. for New Trial at 5.)  These comments were elicited during Defense counsel's admittedly "aggressive questioning" of Williamson.  (Mar. 17, 2008 Tr. at 89.)  Defendant did not move for a mistrial in the wake of this testimony nor did he move to strike this testimony from the record.  Nevertheless, he now asserts that he was prejudiced by these stray remarks.  Defendant is not entitled to a new trial on this basis, however, because defense counsel cannot complain that he was unfairly prejudiced by testimony that he is responsible for eliciting.  *United States v. Harris*, 368 F. Supp. 697, 710 (D.C. Pa. 1973) ("[A] prejudicial item of evidence or a trial setback experienced by defense counsel cannot be complained of if it was caused by defense counsel.")

Furthermore, Defendant was not prejudiced by this testimony.  Even if Williamson's reference to McCracken having been indicted could have prejudiced the Defendant, any possible prejudice was ameliorated by the Court's *sua sponte* curative instruction to the jury:

> [T]he last witness who was on the stand answered a question and indicated that Mr. McCracken left [RBI] because he was indicted.  That indictment had nothing to do, was separate and apart from this case.  So I don't want you to think it had anything to do with this case.  And it's important that you know that.  I had asked the government to make sure, to check over the lunch break, as to what he was indicted for and it had nothing to do with this

24

case.

 (Mar. 17, 2008 at 90.)

 Likewise, any possible prejudice to the Defendant from Williamson's stray remark about a potential guilty plea was ameliorated by Hanzel's testimony clarifying that remark:

> Q: All right.  And with respect, then, to that last part we were talking about, you did not tell her that Mr. Root ever had any intention to plea to this case, did you?
>
> A. No, that was just so out of line because I had just started talking to people and my job was much like my job as a special agent with the IRS.  I was doing an investigation to determine if there was any culpability, and she was one of the first people I talked to.
>
> Q: All right.
>
> A: So I had no idea of Mr. Root's guilt or innocence.

(Mar. 19, 2008 Tr. at 194.)  Further, Williamson's testimony was already fairly benign since Williamson put the statement in context.  She testified on recross-examination that Hanzel said to her "depending what you have to say, maybe Tom will take a plea.  And if he — if you don't talk to me, then we're going to have to put you on the stand and we're going to have to say in court that you didn't cooperate with us."  (Mar. 17, 2008 Tr. at 84.)

 Accordingly, since the testimony of which Defendant complains were elicited by his own counsel, and since those comments did not prejudice him in any way, Defendant is not entitled to a new trial in this regard.

   *3. Defendant was not prejudiced by late disclosure of Brady information*

 *Brady v. Maryland*, 373 U.S. 83 (1963) requires the government to disclose to a defendant exculpatory evidence that is material to guilt or punishment.  *United States v. Bagley*, 473 U.S. 667, 674 (1985).  "[A] defendant is entitled to a new trial where 'there is a reasonable probability that,

had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Gov't of the Virgin Islands v. Martinez*, 780 F.2d 302, 306 (3d Cir. 1985) (*quoting Bagley*, 473 U.S. at 683). "In order to find a *Brady* violation in the first place, a court must find that some prejudice ensued to the defendant." *Gov't of the Virgin Islands v. Fahie*, 419 F.3d 249, 256 n.10 (3d Cir. 2005). "Where the government makes *Brady* evidence available during the course of a trial in such a way that a defendant is able to effectively use it, due process is not violated and *Brady* is not contravened." *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir. 1987).

Defendant asserts that he was prejudiced because he received "voluminous *Brady* documents approximately one week before trial," and because the Government only produced certain documents, such as a spreadsheet from Parker and a summary from Ford, shortly before trial. (Def.'s Mot. for a New Trial at 3-4.) It is clear that the Government turned this evidence over to the defense either the same day or the day after it was received by the Government, and in any event, prior to the start of trial.[10] (Gov't's Consolidated Resp. to Def.'s Mot. for J. of Acquittal and Mot. for a New Trial Attachment 1 (3/14/2008 Letter enclosing transcripts and fax from George Ford) & Attachment 2 (3/15/2008 E-mail enclosing spreadsheet from Parker) & Attachment 3 (3/12/2008 Letter Disclosing Ford Statement); *see also* Mar. 18, 2008 Tr. at 193-95.) Clearly then, Defendant was able to use this information at trial, and thus, his argument that he was prejudiced in violation of *Brady* fails. *See Johnson*, 816 F.2d at 924 (no *Brady* violation where government failed to produce fingerprint reports prior to trial but produced the reports in time for defendant to use in cross-examination); *United States v. Campagnuolo*, 592 F.2d 852, 861 (5th Cir. 1979) (no *Brady* violation

---

[10] One document of which Defendant specifically complains was not even in existence until the weekend before trial. (Mar. 18, 2008 Tr. at 64-65.)

where government's production of exculpatory evidence on the day before trial did not prejudice the defendant); *United States v. Kerr*, Crim. A. No. 07-3, 2008 WL 1943440, at *6 (W.D. Pa. May 2, 2008) (no *Brady* violation where the government produced photographs intended for use at trial to the defendant three business days prior to jury selection.)  Since Defendant has not established a *Brady* violation, he is not entitled to a new trial on that ground.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's motions are denied.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES, | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | |
| THOMAS L. ROOT | : | No. 07-149 |
| | : | |

## ORDER

**AND NOW**, this **10th** day of **June, 2008**, upon consideration of Defendant's Motion for a New Trial (Document No. 59), Defendant's Motion for Judgment of Acquittal (Document No. 60), the Government's Response thereto, Defendant's Reply thereon and for the foregoing reasons, it is hereby **ORDERED** that:

1.      Defendant's Motion for Judgment of Acquittal is **DENIED**.

2.      Defendant's Motion for a New Trial is **DENIED**.

**BY THE COURT:**

_____

**Berle M. Schiller, J.**